UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                      No. 16-cr-20568

vs.                                      Hon. Gerald E. Rosen

SIDNEY DOWL and
ANGELA AVERY,

        Defendants.
_____/

OPINION AND ORDER REGARDING DEFENDANTS'
MOTION TO SUPPRESS EVIDENCE

      At a session of said Court, held in
      the U.S. Courthouse, Detroit, Michigan
      on January 19, 2017

      PRESENT:  Honorable Gerald E. Rosen
                           United States District Judge

Defendants Sidney Dowl and Angela Avery are charged in a 23-count indictment with conspiring to defraud the Internal Revenue Service (the "IRS") and the U.S. Treasury by preparing and filing false individual income tax returns to collect tax refund payments (Count 1), filing false claims (Counts 2-15), and aggravated identity theft (Counts 16-23).[1] The charges against Defendants arise from evidence discovered on

---

[1] Defendants were originally charged in a Criminal Complaint in October 2014 but two months later, on the Government's motion, the Complaint was dismissed, without prejudice. *See United States v. Dowl, et al.*, No. 14-mj-30532.

October 17, 2011, during a search of a van owned by Defendant Avery after it was impounded following the arrest of Defendant Dowl, who was driving the van at the time. Defendant Avery now moves to suppress the evidence found during the search. Defendant Dowl has joined in the motion. For the reasons set forth below, Defendants' motion will be denied.

## II. PERTINENT FACTS

In the afternoon of October 17, 2011, Southfield Police Officer Tracey Krettlin stopped a 1999 Chevrolet Express van on 8 Mile Road near Beech Plaza for having illegally-tinted windows and excessive radio noise. The van was registered to Defendant Angela Avery who was not present in the van at the time of the stop. The van was being driven by Defendant Sidney Dowl. Defendant Dowl was accompanied by his aunt, Katina Dowl.

Upon being stopped, Dowl provided his name to Officer Krettlin and admitted that he did not have a driver's license because it had been suspended. Dowl also disclosed that he was on probation for receiving and concealing stolen catalytic converters.[2]

Officer Krettlin thereafter conducted a LEIN check on Dowl, which verified that

---

[2] Although not disclosed, Dowl was also on parole from the Michigan Department of Corrections for multiple crimes. Dowl has an extensive criminal record and a record of non-compliance with the terms of his parole. [*See* Dkt. # 22, Order of Detention Pending Trial, Statement of Reasons for Detention, p. 4].

Dowl lacked a driver's license, and that he had been convicted 11 times for driving on a suspended license. The LEIN check also revealed that Dowl was wanted for multiple traffic arrest warrants from Detroit, Allen Park, Garden City, and Warren; some of the warrants involved a pre-set bail figure, including $3,000 for Allen Park, $500 for Garden City, $5,000 for Warren (for a marijuana case) and $3,500 for Warren for a receiving and concealing case.

Following the LEIN check, Dowl was placed under arrest for driving on a suspended license and was issued a citation for the illegal dark-tinted windows. Dowl was then transported to the Southfield Police Department. He arrived at the police department between 3:00 and 3:30 p.m. A lieutenant thereafter set Dowl's bail at $100. In the meantime, Ross Towing was called to tow the van away.

Before the van was towed, pursuant to Southfield Police Department policy, Officer Krettlin performed an inventory search of the interior.[3] In conducting the search,

---

[3] Southfield's Police Towing and Vehicle Impoundment Policy provides, in relevant part:

> 5. An inventory search of the vehicle shall also be conducted by the officer(s) impounding the vehicle.
>
>    a. The officer conducting the search shall note the interior and exterior condition of the vehicle and list all items of value.
>
>       I. When accessible, closed or locked containers shall be opened and the contents listed in the vehicle inventory.

3

Officer Krettlin observed a number of miscellaneous papers in the van between the front seats. Krettlin noted the miscellaneous papers on his inventory list, but as the papers did not have any readily apparent value, he did not seize them. Ross towing subsequently removed the van to its lot in Southfield.

Around the time when Dowl was being booked at SPD headquarters, Front Desk Officer Anthony McNeil received multiple telephone calls about Avery's van and how it could be reclaimed. McNeil reported these inquiries to Officer Patricia Meyer and also to Watch Commander Lieutenant John Fisher. Fisher found the phone calls to be a red flag perhaps indicating that contraband was located inside the van.

Between 10:00 and 10:30 p.m. that evening, Officer McNeil received a telephone call about Dowl, who was still in jail at the police station. The call had been transferred from the Michigan State Police to the Southfield Police Department, and then to Officer McNeil on the front desk. The female caller said she had information about Dowl but she wanted to remain anonymous. She said that she was a friend of Dowl and his girlfriend, Angela Avery, and that she knew that Dowl had been arrested and was in

---

II. Portable items of substantial value, such as money, jewelry, etc., shall be placed in evidence for safekeeping at the station.

[Government Ex. 1, Police Pound & Towing Service & Vehicle Impoundment Policy, pg. 3, ¶ V.A.5.]

4

custody at the Southfield jail.

The caller then reported that approximately two weeks earlier, she had overheard Dowl and Avery discussing "bogus IRS checks" that were inside Avery's Chevy van, which by then had been impounded by Officer Krettlin.

Officer McNeil reported the call to Watch Commander Fisher. He also discussed the call with Officer Meyer.

Meanwhile, at about 10:30 p.m., Angela Avery arrived at the Southfield Police Department lobby, and attempted to post bond for one of Dowl's warrants from Warren.[4] Having just learned that Avery was a suspect in the newly-reported allegation, Officer Meyer went out to the lobby to speak with her, in an attempt to gain information. Meyer knew from her police work that often personal identification information is stolen from medical offices. Therefore, as a ruse, Meyer claimed to recognize Avery and asked if she worked in a doctor's office. Avery told Meyer that she did not work at a medical office; she worked at Quicken Loans. Believing that Avery had just admitted working in an environment where personal identification information was commonly available -- which might facilitate identity theft -- Meyer ended the conversation and went back into the station area and reported what she had learned to Lieutenant Fisher and Officer McNeil.

Shortly thereafter, Lieutenant Fisher dispatched Specialist Katie Schneider to go

---

[4] Although Officer McNeil's report [Government Ex. 7] states the time was 23:30 (i.e., 11:30 p.m.), McNeil testified that this was a typographical error; in actuality the time was 22:30 (10:30 p.m.).

to Ross Towing to check the van for the reported items. Around 11:00 p.m., Schneider searched the van where, in a shoebox on the floor of the van between the driver's and passenger's seats, she found a calendar, a notebook and other papers with handwritten names, dates of birth and Social Security numbers. [*See* Schneider report at Government Ex. 7.] In the glove box of the van, she found a vehicle's owner manual, and inside the cover of the manual she found three U.S. Treasury checks written to three different people. *Id.* One check was made payable to Willie Williams at 20567 Rosemont Avenue, Detroit (Dowl's address); another was payable to Tyrone Allen at 20575 Rosemont Avenue, Detroit (Angela Avery's address); and the third one was payable to Davina Lloyd at 8411 Stahelin, Detroit (Katina Dowl's address). The checks had been endorsed for deposit into Avery's bank account. Officer Schneider seized these materials around 11:00 p.m. on October 17th. *See id*.

    The next day, October 18, 2011, at around 11:30 a.m., Avery reclaimed the van after paying the requisite fines and costs.

    Through the evidence found in the van, the IRS's Criminal Investigation Division was later able to connect Dowl and Avery to a scheme to file false tax returns.[5] This

---

[5] According to the Affidavit of IRS Special Agent Elizabeth Russo filed in support of the Criminal Complaint in Case No. 14-mj-30532, the IRS's investigation established that Dowl and Avery recruited individuals to have their tax returns prepared, and sharing the proceeds with them. With respect to other false returns, Dowl and Avery used stolen personal identification information, including names and Social Security numbers, to file false tax returns. The returns were filed electronically with the IRS, with many being filed electronically from Dowl's house on Rosemont in Detroit.

indictment ensued.

Defendants now move to suppress the evidence found in Defendant Avery's van claiming that the search of the van was done without a warrant and without the probable cause required to support a warrantless search pursuant to the "automobile exception."

### III. DISCUSSION

A. THE SOUTHFIELD POLICE HAD SUFFICIENT PROBABLE CAUSE TO BELIEVE THAT EVIDENCE OF A CRIME WOULD BE FOUND IN THE VAN

Under the Fourth Amendment's "automobile exception," when police have probable cause to believe that contraband or evidence of a crime is located inside a vehicle, they may search the vehicle, and any areas within it, without a search warrant, and without exigent circumstances. *California v. Acevedo*, 500 U.S. 565, 580 (1991); *United States v. Johns*, 469 U.S. 478 (1985); *United States v. Ross*, 456 U.S. 798, 804-09 (1982).

The impoundment of the vehicle does not render the automobile exception inapplicable: a lawfully seized vehicle can be impounded, removed from the highway, and later searched; assuming probable cause, no exigent circumstances are required.

---

In 2011, Dowl and Avery filed false federal and state tax returns for the year 2010, and collected tax refund payments in the names of multiple individuals. These refunds included U.S. Treasury checks which were mailed to Dowl's address on Rosemont, to Avery's home address next door on Rosemont, and to Katina Dowl's address. Dowl also had Treasury tax refunds electronically deposited in bank accounts which he or Avery controlled, and in some cases, the refunds were credited to debit cards which Dowl and Avery obtained known as "stored value" cards.

*Maryland v. Dyson*, 527 U.S. 465 (1999); *Florida v. Meyers*, 466 U.S. 380, 382 (1984); *Michigan v. Thomas*, 458 U.S. 259 (1982).

There are no temporal or numerical limitations on searches under the automobile exception.

In *Meyers*, as in this case, the police first conducted an inventory search of the car, and eight hours later, after the vehicle was impounded in a locked secure place, it was searched a second time. The Supreme Court found the search to be legal. In *Thomas*, the police initially performed an inventory search and then later performed another search when the car was in police custody. Again, the Court determined that the search was legal.

In *United States v. Donahue*, 764 F.3d 293 (3rd Cir. 2014), after the defendant was arrested and his car impounded, officers searched the car multiple times five days after his arrest and the car's seizure. In reversing a suppression order, the Third Circuit stressed that under the automobile exception, there are "virtually no temporal, physical, or numerical limitations on the search's scope." *Id.* at 296. Accordingly, the government can search an impounded vehicle without a warrant "even though it has secured the vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search." *Id*.

In *United States v. Gastiaburo*, 16 F.3d 582 (4th Cir. 1994), 38 days after the defendant's car was impounded, a friend of the defendant told the police about a hidden

compartment in the car where drugs and a gun were hidden. The police promptly searched the car and the Fourth Circuit upheld the search. Rejecting the claim that the 38-day time period between the arrest and warrantless search was too long, the court noted, "[T]he Supreme Court has repeatedly stated that a warrantless search of a car (1) need not occur contemporaneously with the car's lawful seizure and (2) need not be justified by the existence of exigent circumstances." *Id.* at 587.

Therefore, contrary to Defendants' contention, there is no temporal limitation on the application of the automobile exception, nor is application of the exception precluded because the car was immobilized.

> The justification to conduct a warrantless search . . . does not disappear merely because the car has been immobilized and impounded. . . . [T]he fact that impoundment may have made it virtually impossible for anyone to drive the car away or to tamper with its contents is irrelevant to the constitutionality of a warrantless search.

*Id.* at 586.

The fact that sufficient time to obtain a warrant has passed between the seizure of the vehicle and the search does not invalidate the search, either. *United States v. Mitchell*, 538 F.2d 1230, 1232 (5th Cir.1976) (*en banc*), *cert. denied*, 430 U.S. 945 (1977). *See also United States v. McBee*, 659 F.2d 1302, 1305 (5th Cir. 1981), *cert. denied*, 456 U.S. 949 (1982); *United States v. Whitfield*, 629 F.2d 136, 141-42 (D.C. Cir. 1980) (police may search a motor vehicle based on probable cause without a warrant even though they have had time to obtain one). *Cf.*, *Cardwell v. Lewis*, 417 U.S. 583, 595, 94 S.Ct. 2464,

2472 (1974) ("[W]e know of no case or principle that suggests that the right to search on probable cause [is] foreclosed if a warrant was not obtained at the first practicable moment.")

Defendants also argue that the automobile exception to the warrant requirement does not apply because probable cause was lacking where the search was begun only after the receipt of an anonymous tip from an unidentified informant. The tip, however, is not the only evidence in this case giving rise to probable cause.

Moreover, there are sufficient indicia to render the telephone tipster reliable.

The Supreme Court found sufficient reliability in a 911 call to justify the police officer's reliance on information in the call in stopping and searching the defendant's car in *Navarette v. California*, 134 S.Ct. 1683 (2014).

In *Navarette*, a 911 caller reported being run off the road by a certain colored car and gave a plate number. The car and driver were located by police a short while later. Upon approaching the car, the officers smelled marijuana. Accordingly, they searched the driver and the glove box of the car, where they discovered marijuana. The driver was then prosecuted on drug charges. His motion to suppress the evidence was denied and the Supreme Court affirmed.

With respect to the reliability of the 911 call, in addition to determining that the caller had reported "eyewitness" information, the Court had this to say:

> Another indicator of veracity is the caller's use of the 911 emergency system. . . . A 911 call has some features that allow for identifying and

> tracing callers, and thus provide some safeguards against making false reports with immunity. *See* [*Florida v.*] *J.L.*, [529 U.S. 266], 276, 120 S.Ct. 1375 [(2000)] (KENNEDY, J., concurring). As this case illustrates . . . , 911 calls can be recorded, which provides victims with an opportunity to identify the false tipster's voice and subject him to prosecution, *see, e.g.*, Cal. Penal Code Ann. § 653x (West 2010) (makes "telephon[ing] the 911 emergency line with the intent to annoy or harass" punishable by imprisonment and fine); *see also* § 148.3 (2014 West Cum. Supp.) (prohibits falsely reporting "that an 'emergency' exists"); § 148.5 (prohibits falsely reporting "that a felony or misdemeanor has been committed"). The 911 system also permits law enforcement to verify important information about the caller. In 1998, the Federal Communications Commission (FCC) began to require cellular carriers to relay the caller's phone number to 911 dispatchers. 47 CFR § 20.18(d)(1) (2013) (FCC's "Phase I enhanced 911 services" requirements). Beginning in 2001, carriers have been required to identify the caller's geographic location with increasing specificity. §§ 20.18(e)-(h) ("Phase II enhanced 911 service" requirements). And although callers may ordinarily block call recipients from obtaining their identifying information, FCC regulations exempt 911 calls from that privilege. §§ 64.1601(b), (d)(4)(ii) ("911 emergency services" exemption from rule that, when a caller so requests, "a carrier may not reveal that caller's number or name"). None of this is to suggest that tips in 911 calls are *per se* reliable. Given the foregoing technological and regulatory developments, however, a reasonable officer could conclude that a false tipster would think twice before using such a system. The caller's use of the 911 system is therefore one of the relevant circumstances that, taken together, justified the officer's reliance on the information reported in the 911 call.

134 S.Ct. at 1690 (some internal citations omitted).

As in *Navarette*, the tip here was reliable.

Among the factors that the *Navarette* Court found significant with respect to the reliability of the 911 call in that case were (1) the caller's apparent eyewitness knowledge of an allegedly dangerous activity; (2) that the call was placed soon after the caller perceived the event, and (3) that the caller used the 911 system. 134 S.Ct. at 1689-90.

These factors are present here.  First, there is indicia that the caller was likely an "eyewitness" (or "earwitness," so to speak) to criminal activity:   The caller had overheard Avery and Dowl discussing "bogus IRS checks" that were located inside Avery's van.  The call was placed relatively soon -- just two weeks -- after overhearing the conversation and only hours after Dowl's arrest and the impoundment of Avery's van.  Finally, the caller had telephoned the Michigan State Police to report the tip.  Although the call apparently was not made to 911,[6] it is nontheless reasonable to credit the call because it could be traced and, as Officer McNeil testified, it was, in fact, recorded.  Significantly, in Michigan, as is the case with making false reports to a 911 service, it is illegal to make a false report of crime to police.  *See* M.C.L. § 750.411a.

Furthermore, the police already had information corroborating what the caller had said, including that there were "miscellaneous papers" inside the van, that there was some sort of relationship between Avery and Dowl in that Avery owned the van that Dowl had been driving and that Avery had come to post bail for Dowl, and that Avery worked in a position where personal identification information was readily accessible and could be stolen.  The police also already had a reasonable suspicion that contraband might be located in the van in light of the various phone calls on October 17th inquiring as to how and when the van could be reclaimed.

---

[6] Officer McNeil testified that if this were a 911 call, it would have gone directly to SPD dispatch, not to the front desk.  This call, however, was a "non-emergency" call made to the State Police.  Hence, it was transferred to the SPD front desk.

Taking all of these facts together, and all reasonable inferences, and adding in the experience of the officers, it was reasonable for the police to conclude there was probable cause to believe that evidence of a crime might be found in the van or that contraband (i.e., counterfeit IRS checks) might be located there.

Therefore, the automobile exception to the warrant requirement is applicable.

B.  THE INVENTORY SEARCH EXCEPTION ALSO APPLIES

An inventory search of a police-impounded automobile is a recognized exception to the warrant requirement. *See Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 (1987); *Illinois v. Lafayette*, 462 U.S. 640, 643, 103 S.Ct. 2605, 2608 (1983); *South Dakota v. Opperman*, 428 U.S. 364, 367-76, 96 S.Ct. 3092, 3096-3100 (1976). Such inventory searches "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Bertine*, 479 U.S. at 372, 107 S.Ct. at 741. An inventory search may not be conducted for purposes of investigation and must be conducted according to standard police procedures. *See Florida v. Wells*, 495 U.S. 1, 5, 110 S.Ct. 1632 (1990). However, the fact that an officer suspects that contraband may be found does not defeat an otherwise proper inventory search. *See United States v. Harvey*, 16 F.3d 109, 112 (6th Cir.), *cert. denied*, 513 U.S. 900 (1994). And, as with the automobile exception, there are no temporal or numerical limitations on inventory searches. *See e.g.*, *United States v. Decker*, 19 F.3d 287, 289 (6th Cir. 1994) (inventory search conducted one week after

seizure of the vehicle held proper).

An inventory search is proper where three conditions are met. *United States v. Smith*, 510 F.3d 641, 651 (6th Cir. 2007). First, police must have "lawfully taken control of [the] vehicle." *Id.* at 651 (citing *Florida v. Wells*, 495 U.S. 1, 5, 110 S.Ct. 1632, 1635 (1990)). Second, the inventory search must be conducted in accordance with "standardized criteria," or "established routine." *Wells*, 495 U.S. at 4. Finally, the policy authorizing an inventory search must itself be reasonable, and it may not provide officers with "'uncanalized discretion'" in conducting inventories. *United States v. Kimes*, 246 F.3d 800, 805 (6th Cir.2001) (quoting *Wells*, 495 U.S. at 4).

All three of the *Smith/Wells* conditions are satisfied here. First, it is undisputed that the Southfield Police had lawfully taken control of Avery's van: Avery, the registered owner of the van, was not present at the time and Dowl, the driver, had been arrested for driving on a suspended license. The SPD Vehicle Impoundment Policy provides that when an arrest is made, the vehicle is to be impounded for safekeeping. *See* SPD Policy, Government Ex. 1, pg. 7, ¶V.E. The Policy further provides that when a vehicle is impounded "[a]n inventory search of the vehicle shall be conducted. . . ." *Id.* ¶ V.A.5. Finally, the Policy, itself, is reasonable -- it does not allow for "uncanalized discretion" in conducting inventory searches. Rather, it specifically delineates parameters of such searches, *see id.*, and explicitly requires that "[o]fficers shall be diligent in the enforcement of this policy." *Id.* ¶ I.

That the Southfield Police may have also believed that they evidence of criminal activity might be found in the search does not defeat the inventory search exception to the warrant requirement. *See United States v. Harvey*, 16 F.3d at 112; *United States v. Smith*, 510 F.3d at 651. It is only when a vehicle is searched *solely* for the purpose of investigating criminal conduct that validity of the search will be dependent on the application of the probable cause and warrant requirements of the Fourth Amendment. *Bertine*, 479 U.S. at 371; *Harvey, supra*; *United States v. Fleming*, 201 F. Supp. 2d 760, 771 (E.D. Mich. 2002). Here, the testimony was that the search was done to secure items of monetary value (i.e., IRS checks), pursuant to SPD policy. It cannot be said the search was done solely for the purpose of uncovering evidence of criminality.

For these reasons, the Court finds that the warrantless search of Avery's van was proper.

## CONCLUSION

For all of the reasons stated above in this Opinion,

IT IS HEREBY ORDERED that Defendants' Motion to Suppress Evidence **[Dkt. # 36]** is DENIED.

                              s/Gerald E. Rosen
                              United States District Judge

Dated: January 19, 2017

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 19, 2017, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135
